**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IRONE WATFORD,                              :
                                            :    Civil Action No. 04-1388 (SDW)
                Petitioner,     :
                                            :
                v.              :    **OPINION**
                                            :
ROY L. HENDRICKS, et al.,       :
                                            :
                Respondents.    :


**APPEARANCES:**

Petitioner pro se                    Counsel for Respondents
Irone Watford                        Deborah Bartolomey
New Jersey State Prison              Deputy Attorney General
P.O. Box 861                         Division of Criminal Justice
Trenton, NJ 08625                    Appellate Section
                                     P.O. Box 086
                                     Trenton, NJ 08625

**WIGENTON**, District Judge

Petitioner Irone Watford, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Administrator Roy L. Hendricks and the Attorney General of the State of New Jersey.

For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> ... Defendant's convictions arose out of his knife-point abduction and brutal rape of the victim, M.S., the mother of three children, during the early morning hours of November 4, 1993, in Jersey City.  On that night, M.S. had parked in the garage of her apartment building at approximately 3:00 a.m.  As she was locking her car, defendant "came with a knife right on her throat."  He pushed M.S. down onto the floor of the passenger side of the car and said to her, "stay and don't move."  He then hit M.S. "on her lips."
>
> Before she was hit, she saw defendant's face.  She described defendant as a black man with a small mustache.  He was wearing a red nylon t-shirt, baggy pants, sneakers, a black "nylon wrap" or cap around his head and black wool gloves.  Although defendant wore the cap throughout the attack, she was able to see his face.  M.S. estimated that the knife blade was three to four inches long.
>
> After pushing M.S. to the floor of the car, defendant got into the driver's seat and drove to a remote area that M.S. did not recognize.  The trip took about thirty minutes.  During the drive, defendant asked M.S. if she had any money or jewelry.  M.S. told defendant she did not.  At the time, however, she was wearing her wedding ring.  She took her ring off and hit it in her mouth.  Defendant told M.S. to put the pillow that she kept in the car over her head.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

When they reached the remote area, defendant told M.S. to take off her clothes and get in the back seat of the car. She complied because she could see defendant holding the knife.

Defendant also got in the back seat of the car where he sexually assaulted her orally, anally and vaginally. Thereafter, defendant drove M.S. to a second location where again he sexually assaulted her. During the assault, defendant removed sufficient clothing for M.S. to recognize that defendant had a tattoo with writing on his right arm. She was not able to read the writing.

After the second assault, defendant told M.S. to put her clothes back on. He also put his clothes back on and returned to the front seat. At approximately 6:00 a.m., defendant drove to Storms Avenue where M.S. exited the car. While standing outside the car, M.S. asked for her apartment keys. Defendant separated the apartment keys from the car keys and gave them to her. During this time, M.S. was again able to see defendant's face. Defendant told M.S. not to call the police because if she did, he would kill her. Before she left, M.S. also retrieved the car registration and insurance card. Defendant drove away and left M.S. on Storms Avenue.

M.S. was observed by a resident of Storms Avenue, who came to her assistance and called the police. The police arrived and took M.S. to the hospital and began their investigation.

During a taped statement, M.S. described her assailant as being a dark-skinned black male in his mid-to-late twenties, about 170 to 175 pounds with a medium build, wearing a black nylon-type [cloth] tied around his head, which covered his hair, a red nylon t-shirt, baggy multicolored balloon-type pants, a blue knee-length coat, black wool gloves and white sneakers. He carried a foot-long, kitchen-type knife, with a wooden handle and a curved blade. She said he did not mention his name or have an accent, nor did he have any outstanding facial features, thought he did have a flat-type of nose. Asked whether she thought she would be able to identify the man, M.S. answered, "Yes definitely." M.S. also said that he had a tattoo with

writing on his right arm, but that she could not read the writing very well.

Later that day, M.S.'s car was spotted by police parked on Armstrong Avenue.  The police set up surveillance on the car, and at 9:00 p.m., the police saw defendant approach M.S.'s car.  He looked all around and then began looking in the windows of the car.  At one point, defendant moved his hand as if he were going to open the car door, but did not.  He then walked down the street where he was stopped by police. Defendant agreed to accompany police to the station to talk to them about a kidnaping and a sexual assault. M.S. was also transported to the police station where she identified defendant as her assailant.  She also identified defendant's red short sleeve shirt and the tattoo on defendant's right arm.  On his right arm were the words "cool rock ski."

The police thereafter searched defendant's residence for the clothing described by M.S.  They retrieved a pair of white sneakers, a blue winter jacket, a pair of multicolored balloon pants, a head rag, a pair of black winter-type gloves, white underwear and a brown-handled knife.  M.S. identified the blue jacket, the gloves, and the head rag as items defendant wore on the night in question.  The baggy pants were not the same pair, but were similar to the pants worn by defendant during the attack.  M.S. said the knife was also a different knife.  Subsequently, when defendant's blue jacket was examined by police experts for fibers, M.S.'s car keys were found in the jacket pocket.  The police also vacuumed M.S.'s car for evidence.

A State forensic expert testified that from the blue sweat pants worn by M.S. on the night of the assault, the pillow retrieved from the rear seat of M.S.'s car, and the vacuumings from the car, she positively identified fourteen black acrylic fibers that compared to the acrylic fibers present in defendant's gloves.  The expert opined within a reasonable degree of scientific certainty that the fibers retrieved came from defendant's gloves. Although the gloves had been described as wool gloves, looking at the gloves under a microscope the expert could immediately tell that they were in fact acrylic. From defendant's black head rag and his white sneakers,

4

the expert identified two blue Olefin fibers and she
opined within a reasonable degree of scientific
certainty that these fibers came from the carpeting in
M.S.'s car.  From white boxer shorts and the long
thermal underwear worn by defendant at the time of his
arrest, and from defendant's blue jacket, the expert
identified eight blue acrylic fibers that compared to
acrylic fibers found in vacuumings from M.S.'s car, but
the expert did not know the source of this blue
acrylic.  It was not the same acrylic as the carpeting
fiber.

The expert noted that the fibers that were found
were all mass produced, so alone these comparisons
could only show that defendant and M.S. may have had
contact.  Nevertheless, the expert's identification of
three different fiber types and three different colors
that each compared favorably, was a strong indication
that defendant and M.S. had contact with each other and
also with the car, and that the time between that
contact and the collection of the evidence had been
relatively recent.  When told to assume that the
clothing was recovered ab out nineteen hours after the
assault, the expert opined that this gave additional
strength to her conclusions, because over time, as
clothes are worn and removed, some fibers that had been
transferred would be lost.

(RE10, Opinion of Superior Court, Appellate Division, at 2-7.)

B.   <u>Procedural History</u>

Following a jury trial in the Superior Court of New Jersey,

Law Division, Hudson County, Petitioner was convicted of armed

robbery, N.J.S.A. 2C:15-1, second-degree robbery, N.J.S.A.

2C:15-1, first-degree carjacking, N.J.S.A. 2C:15-2, first-degree

kidnapping, N.J.S.A. 2C:13-1(b), first-degree aggravated sexual

assault during a robbery and/or kidnapping, N.J.S.A. 2C:14-

2(a)(3), first-degree aggravated sexual assault while armed,

N.J.S.A. 2C:14-2(a)(4), second-degree sexual assault, N.J.S.A.

2C:14-2(c)(1), fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d), and unlawful possession of a knife, N.J.S.A. 2C:39-5(d).  Petitioner's aggregate sentence was a term of life imprisonment plus eighty years with a sixty-year period of parole ineligibility.

On March 31, 2000, the Superior Court of New Jersey, Appellate Division, affirmed the conviction and sentence. (RE10.)  On July 7, 2000, the Supreme Court of New Jersey denied certification.  (RE7.)

Thereafter, Petitioner filed a state petition for post-conviction relief.  Following briefing and oral argument, the trial court denied relief without holding an evidentiary hearing. (RE6 at 54a.)  On June 16, 2003, the Superior Court, Appellate Division, affirmed the denial of post-conviction relief.  (RE4.) On October 29, 2003, the Supreme Court of New Jersey denied certification.  (RE1.)

This Petition followed.  Respondents have answered the Petition on the merits.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an

application for a writ of habeas corpus in behalf of a
person in custody pursuant to the judgment of a State
court only on the ground that he is in custody in
violation of the Constitution or laws or treaties of
the United States.

With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the

adjudication of the claim

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determinated by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court

precedent "if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,

for the Court, Part II).  A state court decision "involve[s] an

unreasonable application" of federal law "if the state court

identifies the correct governing legal rule from [the Supreme]

Court's cases but unreasonably applies it to the facts of the

particular state prisoner's case," and may involve an

"unreasonable application" of federal law "if the state court

7

either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

    Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  Chadwick v.
Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v.
Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims
presented to, but unadjudicated by, the state courts, however, a
federal court may exercise pre-AEDPA independent judgment.  See
Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000),
cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL
1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell,
290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and
cases discussed therein).

    The deference required by § 2254(d) applies without regard
to whether the state court cites to Supreme Court or other

federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Lambert v. Blackwell</u>, 387 F.3d 210, 260 n.42 (3d Cir. 2004); <u>Lewis v. Pinchak</u>, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   Speedy Trial

Plaintiff contends that he was deprived of his state and federal rights to a speedy trial due to a gap of more than three years between his arrest and the beginning of his trial.[2]

The Appellate Division rejected Petitioner's claim that his rights to a speedy trial were violated.

> Defendant contends that his convictions must be vacated because his federal and state rights to a speedy trial were violated.  Citing the four criteria established by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972), defendant asserts that a speedy trial violation occurred here because: (1) there was a period of three years and five months between his arrest and the commencement of the trial; (2) the State unduly delayed in presenting the gathered evidence to the State Lab, and there was no sound reason for the delay; (3) defendant asserted his speedy trial right at his arraignment in December 1994 and then again in a motion in March 1995; and (4) the delay prejudiced defendant through oppressive pretrial incarceration, causing defendant anxiety and concern, and impaired his defense because his incarceration prevented him from gathering evidence and contacting witnesses.

> The United States Supreme Court has formulated a four-part test to analyze a defendant's Sixth-Amendment speedy trial claim by evaluating these factors: (1) the length of the delay; (2) the reasons for the delay: (3) whether the defendant asserted his right; and (4) the

_____

[2] It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Thus, Petitioner is not entitled to relief based upon any violation of his state law right to a speedy trial.

prejudice to the defendant caused by the delay.
<u>Barker</u>, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d
at 116.  These factors were adopted by the New Jersey
Supreme Court in <u>State v. Szima</u>, 70 N.J. 196, 200-02,
<u>cert. denied</u>, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d
180 (1976).  None of these enumerated factors is
singularly regarded as "either a necessary or
sufficient condition to the finding of a deprivation of
the right to a speedy trial.  Rather, they [are] to be
treated as related factors to be considered with such
other circumstances as may be relevant."  <u>Id.</u> at 201;
<u>See also</u> <u>Barker</u>, 407 U.S. at 533, 92 S.Ct. at 2193, 33
L.Ed.2d at 118.  Therefore, the "application of a
balancing of interests test must be on an <u>ad</u> <u>hoc</u> basis
and necessarily involves subjective reaction to the
balancing of the circumstances."  <u>Szima</u>, 70 N.J. at
201.

Applying the first <u>Barker</u> factor to the present
case, there is no question that the period from
defendant's arrest on November 4, 1993, to the
commencement of trial on April 29, 1997, was a delay of
sufficient length to trigger inquiry about defendant's
right to a speedy trial.  Cases involving delays of
lesser duration have been found violative of speedy
trial rights.  <u>See</u> e.g., <u>Klopfer v. North Carolina</u>, 386
U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (finding
that an eighteen-month delay violated defendant's right
to a speedy trial).

Regarding the second <u>Barker</u> factor, here, the
record shows that there were many delays in moving the
case to trial, some of which were attributable to
defendant, some to the State and others to the court
system.  Defendant's change of counsel delayed the case
in April and May 1995, and his counsel's non-attendance
and requests for adjournment further delayed matters in
October 1995, May 1996, September 1996 and February
1997.  The prosecutor made only one adjournment
request, postponing the trial for three weeks in April
1997.  Defendant makes much of a one-year delay caused
by the State lab's request for hair, blood and saliva
samples from defendant.  Defendant, however, was
involved in causing this delay, because he apparently
refused to give the samples and required the State to
file a motion.  The motion was filed in August 1994,
but the record does not indicate when the motion was
granted, and the samples were not actually collected

11

until June 1995.  This delay occurred during the period
when defendant was in the midst of obtaining new
counsel, however, so it can be assumed that this, in
addition to defendant's intervening motions and appeal
of one motion, contributed to the delay.  Reviewing the
record of delays on the whole, "although a substantial
amount of time lapsed between defendant's arrest and
the beginning of the trial, there is no indication that
the prosecution intentionally delayed the proceedings
to gain an unfair, tactical advantage."  State v. Long,
119 N.J. 439, 471 (1990).

In applying the third Barker factor, there is no
doubt that defendant asserted his right to a speedy
trial.  Finally, the fourth Barker factor looks at
prejudice to the defendant.  Here defendant broadly
states that the delay prejudiced him through oppressive
pretrial incarceration, causing him anxiety and
concern, and by impairing his defense because his
incarceration prevented him from gathering evidence and
contacting witnesses.  These were the considerations
listed by the Court in Barker, 407 U.S. at 532, 92
S.Ct. at 2193, 33 L.Ed.2d at 118, where the Court
recognized impairment of the defense as the most
serious concern.

Here, however, defendant does not demonstrate any
way in which his defense was impaired, and none is
obvious from the presentation of the case.  Given the
isolated and remote areas where defendant committed the
crimes, there would be no expectation of additional
fact witnesses that he could gather, and there was no
assertion that there had been fact witnesses who died
or had faded memories.  Defendant did not claim an
alibi, so there was no need for alibi witnesses, and he
had an expert witness to refute the State's expert
testimony regarding the physical evidence.  Thus,
although defendant was incarcerated for that entire
pretrial period, no prejudice to the preparation of his
defense is evident.

Similarly, defendant did not articulate other
specific areas of prejudice.  He was unemployed, so his
incarceration did not affect any particular position,
although it did affect his ability to obtain a job
during the pretrial period and his personal liberty.

          In sum, balancing all of these factors,
     defendant's own responsibility for the delay in the
     beginning of his trial and the lack of any prejudice to
     his defense, militate against the conclusion that the
     State denied defendant his right to a speedy trial.  We
     conclude that even though the delay between defendant's
     arrest and the beginning of the trial was drawn out,
     under these circumstances, the delay did not constitute
     a violation of defendant's right to a speedy trial.

(RE10, Opinion of Superior Court, Appellate Division, at 9-13.)

     The Sixth Amendment provides, in pertinent part, "In all

criminal prosecutions, the accused shall enjoy the right to a

speedy and public trial ... ."  U.S. Const. amend. VI.  The right

to a speedy trial is "fundamental" and is imposed on the states

by the Due Process Clause of the Fourteenth Amendment.  Kloper v.

North Carolina, 386 U.S. 213, 223 (1967).  See also Barker v.

Wingo, 407 U.S. 514 (1972).  In Barker, the Supreme Court set

forth four factors to be weighed and balanced to determine

whether the Sixth Amendment's guarantee of a speedy trial has

been violated:  (1) the length of the delay; (2) the reason for

the delay; (3) whether, in due course, the defendant asserted his

right to a speedy trial; and (4) the prejudice to the defendant.

See id. at 530; see also United States v. Dent, 149 F.3d 180, 184

(3d Cir. 1998), cert. denied, Dent v. United States, 525 U.S.

1085 (1999).

     Here, the Appellate Division correctly identified the

applicable Supreme Court precedent.  The decision of the

Appellate Division is neither contrary to nor an unreasonable

application of the governing federal law, nor did it result in an unreasonable determination of fact in light of the evidence presented.[3]  Petitioner is not entitled to relief on this claim.

B.   <u>Prosecutorial Misconduct</u>

Petitioner contends that the prosecutor overstepped the bounds of fair advocacy in his closing statement to the jury. The Appellate Division rejected on direct appeal Petitioner's claim of prosecutorial misconduct.

> Defendant contends that the prosecutor's comments during his closing argument overstepped the bounds of fair advocacy and deprived defendant of the right to a fair trial.  Defendant asserts that through the improper comments, the prosecutor attempted to seek sympathy from the jury for M.S., and also attempted to suggest that the jury convict "if they were viscerally appalled by the crimes" even if there was insufficient evidence against defendant.  Defendant noted that the trial judge reprimanded the prosecutor for his remarks, but defendant asserts that this was not enough, because the judge gave no curative instruction.
>
> Defendant argues that three parts of the prosecutor's closing argument was improper.  In the first, referring to M.S.'s testimony, the prosecutor said:
>
>> Let me say this to you, a very interesting thing happened when she couldn't identify the defendant initially, did you see that demeanor?

---

[3] In his Reply and Supplemental Documents [Docket Entries Nos. 14, 15], Petitioner argues that more than a year of delay was attributable to the prosecutor's failure to provide defense counsel with discovery.  It does not appear that this argument was made in Petitioner's direct appeal.  In any event, it does not alter the outcome of the <u>Barker</u> balancing test.  Even if some or all of the delay during that period were attributable to the state, the complete lack of impairment to Petitioner's defense outweighs the impact of that delay.

Did she strike you as the type of actress capable
of receiving an academy award?  Or, perhaps she
failed to read the manual on how rape victims are
supposed to act, how rape victims are supposed to
control the amount of seminal material left by
their attacker, how they're supposed to control
the amount of hair, the length of hair, the
location of the hair that their attacker leaves
behind.  No, the manipulator only cold have done
that, and we're going to talk about those things
that he did [so as] not to leave evidence behind,
not to be seen, not to be identified.

Defendant next highlights comments regarding
defendant's actions where the prosecutor stated:

[defendant is] going to do things that are going
to prevent evidence from being collected, he's
going to instill fear in this 36 year old woman
filled with anxiety ... and he is going to instill
such fear in her that she is not going to be able
to claw at him, make a scratch on his face or pull
his hair.  And she knows the repercussions of what
Mr. tough guy is going to do if she does any of
those things, he's going to punch her again.

Finally, in what defendant characterizes as the
prosecutor's most egregious comments, the prosecutor
continued:

Let me- let me turn the tables on this for
one second, let's assume arguendo for purposes of
this comparison that [M.S.], because of the fear
and-fear of reprisal of this man didn't
immediately report it to the police but went home
and, as a rape victim, showered, changed and
attempted to close the door on this incident, but
she couldn't, and at some future point she reports
the incident to the police.  Does that mean
because she reported it a week or two later that
this man should be allowed back into society with
no repercussions or no responsibility on his part?
He is the only one who bears responsibility in
this case for what happened ...

And isn't she, as an entitled citizen of this
community where she's lived, perhaps, even longer
than this man has been born, she can't do that?

15

> Well, ... I will tell you what sir, you want
> [M.S.'s] car?  You can have it, you can have it
> right now.  You could have had it back then.  Can
> you give her her dignity back, please, can you do
> that?

After this statement the trial judge called the
prosecutor to the side bar and said:

> Stop addressing the defendant directly, address
> your comments to the jury, stop this inflammatory
> oratory, comment on the evidence.  That's what you
> need to do, Mr. Valentin, don't make me consider a
> mistrial at the end of this thing, we're too close
> now, direct your comments to the jury, comment on
> the evidence.  That's all.

The trial judge did not give a curative instruction at
that point, but the prosecutor apparently heeded the
trial judge's admonition.  Defense counsel did not make
any objection regarding any of the prosecutor's
comments, nor did she object to the lack of a curative
instruction.

"Ordinarily a defendant will not be heard to claim
prejudice if defense counsel does not interpose a
timely and proper objection to the improper remarks."
State v. Bogen, 13 N.J. 137, 141-42, cert. denied, 346
U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953) (citation
omitted).  If a timely objection is made, the trial
judge has the opportunity to "rectify the situation or
to reduce the impact of such comment by taking
corrective action."  State v. Bucanis, 26 N.J. 45, 57,
cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d
1160 (1958).  Where, as here, no timely objection was
made, the court must determine whether the comment was
"clearly capable of producing an unjust result."  R.
2:10-2.  The possibility of such an unjust result must
be "'one sufficient to raise a reasonable doubt as to
whether the error led the jury to the result it
otherwise might not have reached.'"  State v. Benedetto,
120 N.J. 250, 261 (1990) (quoting State v. Macon, 57
N.J. 325, 336 (1971)).  Here, the issue is whether
there is a sufficient possibility that the prosecutor's
statements led the jury to find defendant guilty, where
it otherwise might have found him not guilty.

16

No such conclusion can be drawn here, even though
the prosecutor's comments about M.S. getting her
dignity back were improper.  The comments did not rise
to the level of "clearly and unmistakenly improper"
language that "must have resulted in substantial
prejudice to defendant's fundamental right to have a
jury fairly assess the persuasiveness of his case."
<u>State v. Darrian</u>, 255 N.J. Super. 435, 453 (App. Div.),
<u>certif. denied</u>, 130 N.J. 13 (1992).

Moreover, the prosecutor's comments with respect
to M.S.'s right to go home before contacting the police
was in response to comments by defense counsel
suggesting that perhaps the offenses never occurred
because there was an absence of spermatozoa.

There was sufficient evidence to support
defendant's convictions and the trial judge's charge
adequately explained to the jury how it was to consider
the evidence before it.  Accordingly, the prosecutor's
comments did not result in substantial prejudice to
defendant's right to have the jury fairly consider the
case.

(RE10, Opinion of Superior Court, Appellate Division, at 17-20.)

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

He may prosecute with earnestness and vigor – indeed,
he should do so.  But, while he may strike hard blows,
he is not at liberty to strike foul ones.  It is as
much his duty to refrain from improper methods
calculated to produce a wrongful conviction as it is to
use every legitimate means to bring about a just one.
...  Consequently, improper suggestions, insinuations,
and, especially, assertions of personal knowledge are
apt to carry much weight against the accused when they
should properly carry none.

<u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).  "The line

separating acceptable from improper advocacy is not easily drawn;

there is often a gray zone.  Prosecutors sometime breach their

17

duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." <u>United States v. Young</u>, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

<u>Id.</u> at 18.

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. <u>Darden</u>, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative

instructions, and the quantum of evidence against the defendant."
Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, although the Appellate Division relied on state law to decide this issue, its reasoning does not contradict the relevant Supreme Court precedent.  The Appellate Division considered and rejected the claim that the actions of the prosecutor deprived Petitioner of his right to fundamental fairness, finding certain remarks justified based upon their nature as rebuttal to remarks made by defense counsel.  Petitioner is not entitled to relief on this claim.

C.    Jury Instructions

Plaintiff contends that the jury instructions on identification were not tailored to the facts of his case and he challenges the failure to instruct on cross-racial identification.

The Appellate Division rejected Petitioner's jury instructions claims.

> Defendant asserts that he was denied a fair trial by the judge's failure to offer a cross-racial identification charge because M.S. is Filipino and defendant is African-American.  Defendant's counsel did not request a cross-racial identification charge, as contemplated by State v. Cromedy, 158 N.J. 112 (1999). A cross-racial identification charge is required "only when ... identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability."  Id. at 132.  Here, there are many corroborating facts, which remove this case from the category of cases where a cross-racial identification charge would be appropriate pursuant to

19

Cromedy.  Those facts include: the tattoo on
defendant's arm, consistent with M.S.'s description;
the clothes seized from defendant's apartment that
matched those that M.S. described; the hair and fiber
evidence that tended to link defendant to the crime
scene; defendant's own behavior in walking around and
peering into M.S.'s car where it was parked near
defendant's apartment; and the presence of M.S.'s car
keys in defendant's jacket pocket.  All of this
corroborated M.S.'s identification.  None of this
evidence pointed to any other person.  Thus, Cromedy
does not require a cross-racial identification charge
under these circumstances.

Although defendant alleged at trial that M.S.
stated to an investigator that "all blacks look alike,"
this allegation was contested by M.S.  The Cromedy
decision did not address a circumstance where a witness
alleged that the victim made such a statement, but even
here, there is no showing that the absence of a cross-
racial identification charge would lead to plain error.
The jury was presented with the evidence of M.S.'s
alleged statement, and M.S.'s denial of having made the
statement.  In closing arguments, defense counsel
methodically outlined the difficulty M.S. would have
had in viewing her assailant in the dark and during the
assault, the unfairness of the out-of-court
identification because defendant was the only black man
in the room, M.S.'s inability to identify defendant at
first in the courtroom, and her belated identification
that occurred only after she breached a court order and
spoke with the prosecutor.  The jury therefore knew
that identification of defendant was a key issue, and
they knew that M.S. had allegedly said she could not
distinguish black people from one another.  In this
circumstance, the jury did not need any additional
instruction on the problems associated with cross-
racial identification.  That issue was clearly before
the jury.  As such the identification charge here was
no "clearly capable of producing an unjust result."  R.
2:10-2.

(RE10, Opinion of Superior Court, Appellate Division, at 14-15.)

Generally, a jury instruction that is inconsistent with

state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

21

Where such a constitutional error has occurred, it generally
is subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d
at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).
"[I]f the [federal habeas] court concludes from the record that
the error had a 'substantial and injurious effect or influence'
on the verdict, or if it is in 'grave doubt' whether that is so,
the error cannot be deemed harmless."  Id. at 418 (citing
California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a
challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal
quotations and citations omitted).

However, a jury instruction that "reduce[s] the level of
proof necessary for the Government to carry its burden [of proof
beyond a reasonable doubt] is plainly inconsistent with the
constitutionally rooted presumption of innocence."  Cool v.
United States, 409 U.S. 100, 104 (1972).  "[T]rial courts must
avoid defining reasonable doubt so as to lead the jury to convict
on a lesser showing than due process requires."  Victor v.
Nebraska, 511 U.S. 1, 22 (1994); see also Cage v. Louisiana, 498
U.S. 39, 41 (1990).  As the Supreme Court explained in Victor,

> so long as the court instructs the jury on the
> necessity that the defendant's guilt be proved beyond a
> reasonable doubt, the Constitution does not require
> that any particular form of words be used in advising
> the jury of the government's burden of proof.  Rather,
> taken as a whole, the instructions [must] correctly
> conve[y] the concept of reasonable doubt to the jury.

Victor, 511 U.S. at 6 (citations and internal quotation marks

omitted).

"[A] misdescription of the burden of proof ... vitiates all

the jury's findings. Sullivan v. Louisiana, 508 U.S. 275, 281

(1993) (emphasis in original).  Such an error is considered

structural and thus is not subject to harmless error review.  See

id. at 280-82.  But see Neder v. United States, 527 U.S. 1, 8-11

(1999) (applying harmless-error analysis where jury was not

instructed on an element of an offense).

Here, the failure to give identification instructions

tailored to the facts of this case and to the issue of cross-

racial identification did nothing "to lift the burden of proof on

an essential element of an offense."  Moreover, there was

substantial identification evidence other than the testimony of

the victim, including hair and fiber evidence, clothing matching

the victim's description of her assailant's clothing, the tattoo,

Petitioner's suspicious behavior at the victim's parked car, and

the location of the keys to the victim's car in Petitioner's

jacket.  Weaknesses in the identification evidence were amply

demonstrated by defense counsel.  Petitioner was not deprived of

a fair trial by the instructions on identification.  Petitioner
is not entitled to relief on this claim.

D.   Ineffective Assistance of Counsel

Petitioner alleges that he was deprived of effective
assistance of trial counsel, in violation of his rights under the
Sixth Amendment.  Specifically, Petitioner challenges trial
counsel's failures (1) to request a hearing under United States
v. Wade, 388 U.S. 218 (1967), (2) to request a voir dire of the
victim regarding the violation of the court's sequestration
order, (3) to thoroughly cross-examine the victim and
Investigator Quirk on the issue of identification and the
victim's violation of the court's sequestration order, (4) to
aggressively oppose the prosecutor's request that petitioner
display his right upper arm, with the tattoo, to the jury, and
(5) to properly and thoroughly prepare the claim of racial bias
through Investigator Robbins.

On direct appeal, the Appellate Division rejected
Petitioner's claim that his counsel was ineffective for failing
to request a Wade hearing.

> Next, defendant asserts that his counsel was
> ineffective for failing to request a Wade[fn1] haring
> to test the admissibility of M.S.'s out-of-court
> identification.  Our review of the record convinces us
> that any such hearing would have resulted in the
> admissibility of the out-of-court identification.  M.S.
> had ample opportunity to view her assailant during the
> approximately three hours of her ordeal.  Moreover, at
> the conclusion of the assault, M.S. undoubtedly faced
> defendant when she requested her house keys.  As noted

24

in <u>Neil v. Biggers</u>, M.S. "was no casual observer, but
rather the victim of one of the most personally
humiliating of all crimes."  409 U.S. 188, 200, 93
S.Ct. 375, 382-83, 34 L.Ed.2d 401, 412 (1972).  M.S.'s
descriptions of her assailant's clothing and tattoo
were detailed and accurate, and M.S. demonstrated
certainty that defendant was her assailant when she saw
him in police custody.  Finally, it's worth noting that
the identification occurred less than twenty-four hours
after the assault, while her memory was fresh.

[fn1] 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149
(1967).

(RE10, Opinion of Superior Court, Appellate Division, at 15-17.)

In his state petition for post-conviction relief, Petitioner
raised the other claims of ineffective assistance of counsel
raised in this Petition.  The trial court rejected these claims
following a non-evidentiary hearing.

The case that is controlling has been cited
<u>Strickland v. Washington</u>, 466 U.S. at 668, ineffective
assistance of Counsel, and we know that the Petitioner
has to demonstrate that Counsel's performance was
deficient.  That's the first prong.

And the second prong is that the Petitioner must
demonstrate that the deficient performance prejudiced
the Defense.

The Defense here or the Petitioner here say that
the performance was deficient for the reasons
specifically stated by Defense Counsel.  The strategy
of the Defense Counsel with respect to the issues that
have been raised here, the identification issue, the
breach of the Court's Order of Sequestration and the
like, and the fact that the issue regarding the
description and the description by the victim that she
gave to the Investigator of the fact that she said it
was difficult for her to identify the Defendant because
all Blacks look alike, and because he had a flat nose,
those issues we see, we see what the State says was the
strategy of the Defense Counsel as the State perceives
it to be at the particular time of the trial.

25

And also, I would consider perhaps much more in this case telling, the second prong of <u>Strickland</u>, as to whether or not any deficiency on the part of Counsel was so serious that it did result in prejudicing the Defendant, such that, a fair trial was not conducted.

Now the facts of this case which I know both Counsel are aware of very much because I'm mentioning them with respect to the second prong are that: [then followed a detailed recitation of the facts of the crime and the evidence presented at trial.]

...

The Court adopts those facts here as this Court's own findings with respect to the case here with respect to this question that I must delve into regarding the two-prong aspect of <u>Strickland</u>.

The Court in looking at the entire situation with respect to the issue of whether or not even an evidentiary hearing should be conducted here would say, no.  I do not find when I look at the overwhelming evidence that was before the Court, the jury in this particular case, that the three issues that have been raised here to really highlight the ineffective assistance of Counsel claim against the trial defense lawyer, that Counsel's deficient performance, Counsel's performance was deficient basically for the reason cited by the State.

But I say even more importantly, if there was any deficiency on the part of Defense Counsel, certainly, it was not prejudicial to this Defendant as the evidence in this case was overwhelming.

The identification evidence which granted, permeates that in this case, there were the problems after the initial identification with respect to the victim and the breaking of the Court's Order of Sequestration and so forth, but I say almost in judging those at this juncture, that they were de minimis in comparison to the overwhelming evidence that was elicited against this Defendant at trial.  That they pale by comparison.

And so, the Court does deny the motion for those reasons specifically, ... .

(RE26 at 19-25.)  The Appellate Division rejected these claims summarily.

> Defendant contends that his trial counsel's ineffectiveness violated his constitutional right to effective representation under both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10, of the New Jersey Constitution.  To prevail, defendant must demonstrate that: (a) "counsel's performance was deficient," and (b) "there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>State v. Preciose</u>, 129 N.J. 451, 463-64 (1992) (citation omitted).
>
> Under this test, defendant's claim must fail.

(RE4, Opinion of Superior Court, Appellate Division, at 3-4.)

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> at 694.

27

Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland. See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

28

In United States v. Wade, the Supreme Court held that a pre-trial line-up is a critical stage of a prosecution at which the suspect is entitled to counsel; where counsel is absent, the accused is entitled to a hearing to determine whether the identification procedure was so tainted that a subsequent in-court identification should be suppressed.  An accused is entitled to due process protection against the introduction of evidence of, or tainted by, unreliable identifications elicited through unnecessarily suggestive identification procedures.  See generally Manson v. Brathwaite, 432 U.S. 98 (1977) and cases cited therein.

> [R]eliability is the linchpin in determining the admissibility of identification testimony ... .  The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

Manson, 432 U.S. at 114.  See also Simmons v. United States, 390 U.S. 377 (1968) (due process prohibits in-court identification if pre-trial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

An "on-scene" or "show-up" identification is one in which the suspect is apprehended at or near the scene and is returned to it immediately where the victim/witness may make an

29

identification or one in which only one suspect is shown to the victim/witness at a later time.  In <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972), the Supreme Court held that the "admission of evidence of a showup without more does not violate due process."

Although a show-up identification generally is considered more suggestive than a line-up, <u>see</u> <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967), <u>overruled on other grounds</u>, <u>Griffith v. Kentucky</u>, 479 U.S. 314 (1987), a number of Circuit Courts of Appeals, including the Third Circuit Court of Appeals, have held show-up identifications admissible.

> Immediate show-ups can serve ... important interests. For example, show-ups allow identification before the suspect has altered his appearance and while the witness' memory is fresh.  ...  In our view, such considerations will justify a show-up in a limited number of circumstances, such as where the police apprehend a person immediately after the crime and in close proximity to the scene.

<u>United States v. Funches</u>, 84 F.3d 249, 254 (7th Cir. 1996) (citations omitted).  <u>See also</u> <u>U.S. v. Watson</u>, 76 F.3d 4, 6 (1st Cir.), <u>cert. denied</u>, 517 U.S. 1239 (1996); <u>Johnson v. Dugger</u>, 817 F.2d 726, 729 (11th Cir. 1987); <u>United States v. Gaines</u>, 450 F.2d 186, 197 (3d Cir. 1971) (holding that a show-up conducted without counsel was justified by "the fact that the eye-witness might have quickly departed, and the considerations of reliability inhering in an immediate identification"), <u>cert. denied</u>, 405 U.S. 927 (1972).

30

Here, the Appellate Division correctly identified <u>Neil v. Biggers</u> as a relevant precedent and applied the factors enumerated in <u>Manson</u> to determine the reliability of the challenged identifications.  The conclusion of the Appellate Division that the out-of-court identification was properly admitted, and that therefore there was no ineffective assistance of counsel in failing to challenge the identification, is neither contrary to nor an unreasonable application of binding federal precedent.  Petitioner is not entitled to relief on this claim.

Neither is Petitioner entitled to relief on the other claims of ineffective assistance of counsel.  Most of the other claims of ineffective assistance arise out of counsel's handling of the victim's identification of Petitioner.  On direct examination, the victim testified regarding her out-of-court identification of Petitioner, but she was not able to identify Petitioner in court as the person who had kidnapped and assaulted her.  (5T at 66.)  At the conclusion of her direct testimony, the Court ordered her not to discuss her testimony with anybody, including the prosecutor.  Prior to the commencement of cross-examination, the prosecutor advised the court that the victim had told him after her direct testimony, and in the presence of Investigator Quirk, that the man seated at counsel table was the man who committed the crimes against her.  Defense counsel brought out on cross-examination that the victim had told the prosecutor and

31

Investigator Quirk, in violation of the Court's order, that she
recognized Petitioner.  (5T at 11-12.)  Defense counsel also
brought out the circumstances of the original out-of-court
identification, in which Petitioner was alone with two white men,
and that the victim was never asked to identify Petitioner from a
photo array or a line-up of several men.  (5T at 22-23.)  Defense
counsel also explored the victim's experiences with African-
Americans and asked whether she had told an investigator that she
was unable to distinguish the features of African-Americans.  (5T
at 28-29.)  On re-direct, the prosecutor questioned the victim
about her identification of Petitioner during the break in
testimony and asked her if she could identify her assailant.  The
victim then identified Petitioner in court.  (5T at 32-33.)  In
her cross-examination of Investigator Quirk, defense counsel did
not ask about the victim's statement in the break during her
testimony that she could identify Petitioner, which Investigator
Quirk had apparently witnessed.  (6T at 78-79.)  Defense counsel
also elicited testimony from a defense investigator that the
victim had indicated that she couldn't describe her assailant
because, "basically, all blacks look alike to her."  (10T at 35.)
On cross-examination, the defense investigator stated that he had
never made a report of the victim's remarks about her ability to
identify African-Americans and that the lead defense investigator
had never made a report of those remarks.  (10T at 44, 51.)  The

32

victim denied making the statement.  Petitioner's contention that
he received ineffective assistance because of this evidence
regarding the victim's identification of him is meritless.
Defense counsel placed before the jury evidence of various
deficiencies in the victim's identifications of Petitioner,
including the show-up identification, her alleged remarks about
her ability to identify African-Americans, and her violation of
the trial judge's sequestration order.  As the trial court found,
regardless of the quality of defense counsel's preparation and
questioning regarding the identification issue, Petitioner has
failed to demonstrate that absent counsel's alleged errors there
is a reasonable probability that the outcome would have been
different.  Other evidence amply demonstrates Petitioner's guilt.

Finally, Petitioner contends that counsel should have more
aggressively opposed the prosecutor's request that Petitioner
show the jury the tattoo on his arm.  This claim is grounded in
the Fifth Amendment privilege against self-incrimination. U.S.
Const. amend. V ("No person ... shall be compelled in any
criminal case to be a witness against himself").

> In applying the Self-Incrimination Clause of the
> Fifth Amendment, the Supreme Court has recognized a
> controlling distinction between real or physical
> evidence obtained from a defendant's person and that
> which is testimonial.  The Court has upheld action by
> the state compelling an accused to submit to blood
> tests, Schmerber v. California, 1966, 384 U.S. 757, 86
> S.Ct. 1826, 16 L.Ed.2d 908; to try on clothing, Holt v.
> United States, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed.
> 1021, and to exhibit his person for observation, United

33

> States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18
> L.Ed.2d 1149.  In addition, the Court has cited with
> approval cases holding that the privilege against self-
> incrimination 'offers no protection against compulsion
> to submit to fingerprinting, photography, or
> measurements, to write or speak for identification, to
> appear in court, to stand, to assume a stance, to walk,
> or to make a particular gesture.'  United States v.
> Wade, supra, at 223, 87 S.Ct. at 1930, quoting from
> Schmerber v. California, supra, 384 U.S. at 764, 86
> S.Ct. at 1826.

Mitchell v. Pinto, 438 F.2d 814, 816-17 (3d Cir. 1970) (en banc),

cert. denied, 402 U.S. 961 (1971).  Thus, Respondents are correct

that Petitioner had no privilege to refuse to display his tattoo

to the jury.  See, e.g., Gardner v. Norris, 949 F.Supp. 1359,

1374 (E.D. Ark. 1996).  Petitioner is not entitled to relief on

this claim.

F.   Cumulative Error

     The Appellate Division rejected Petitioner's claim of

cumulative error without discussion.  (RE4.)

     Even if none of Petitioner's claims on its own amounts to a

constitutional violation, the "cumulative effect of the alleged

errors may violate due process."  United States ex rel. Sullivan

v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980); see also Pursell v.

Horn, 187 F.Supp.2d 260, 374 (W.D. Pa. 2002) ("That the

reliability of a state criminal trial can be substantially

undermined by a series of events, none of which individually

amounts to a constitutional violation, is an idea that has been

accepted by nearly every federal court to have addressed the

34

issue."). Neither the Supreme Court nor the Court of Appeals for the Third Circuit has established a standard by which a claim of cumulative error must be determined. See Pursell, 187 F.Supp.2d at 374-76 (describing three alternative approaches).

Thus, here, the decision of the Appellate Division that there was no cumulative error amounting to a due process deprivation is neither contrary to nor an unreasonable application of governing federal precedent. This Court agrees that Petitioner has failed to demonstrate cumulative error amounting to a deprivation of his right to due process. Petitioner is not entitled to relief on this claim.

G.   Other Claims

In his Supplemental Memorandum of Law [Docket Entry No. 2], Petitioner presents arguments in support of claims not asserted in the Petition itself. Specifically, Petitioner alleges constitutional deprivations including (1) a deprivation of due process arising out of the failure to arraign him within 72 hours, (2) a deprivation of due process arising out of the out-of-court identification procedure employed by the police, and (3) a violation of his right to be free from cruel and unusual punishment under the Eighth Amendment. He also contends that he is entitled to an evidentiary hearing.

As noted above, these claims are not asserted in the Petition; nor was the Petition amended after Petitioner received

35

the notice required by Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000). Respondents did not answer as to these arguments, and Petitioner did not refer to them in his Reply. Accordingly, this Court does not consider that these claims are properly a part of the Petition before the Court. To the extent the Supplemental Memorandum could be construed as amending the Petition to assert these claims, they are meritless.[4]

1.   Arraignment

Petitioner contends that his due process rights were violated by the failure of the government to subject him to a timely arraignment. Petitioner contends that he was never arraigned before trial, in violation of state law, which he contends incorporates the requirements of the due process clause. The case on which Petitioner relies, Gerstein v. Pugh, 420 U.S. 103 (1975), specifically holds, however, that such a deficiency is not a grounds for invalidating a subsequent conviction.

> In holding that the prosecutor's assessment of probable cause is not sufficient alone to justify restraint of liberty pending trial, we do not imply that the accused is entitled to judicial oversight or review of the decision to prosecute. Instead, we adhere to the Court's prior holding that a judicial hearing is not prerequisite to prosecution by information. Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction. Thus, as the Court of Appeals noted below, although a suspect who is presently

---

[4] Pursuant to 28 U.S.C. § 2254(b)(2), this Court may deny a petition on the merits, notwithstanding a petitioner's failure to exhaust the remedies available in state court.

> detained may challenge the probable cause for that
> confinement, a conviction will not be vacated on the
> ground that the defendant was detained pending trial
> without a determination of probable cause.

Gerstein, 420 U.S. at 119 (citations omitted).  Petitioner is not entitled to relief on this claim.

    2.  Out-of-Court Identification Procedure

    In the context of Petitioner's claim of ineffective assistance of counsel, this Court has already determined that the decision of the Appellate Division that the out-of-court identification was admissible is neither contrary to nor an unreasonable application of federal law.  Thus, this claim is meritless and this Court will not revisit the issue.

    To the extent the allegation could be construed as a challenge to the subsequent in-court identification, the decision of the Appellate Division that the trial judge did not abuse his discretion in permitting the victim to identify defendant on re-direct is neither contrary to nor an unreasonable application of federal law.  The same reliability factors that govern admissibility of the out-of-court identification govern admissibility of the subsequent in-court identification.  Defense counsel was able to highlight for the jury factors that it could consider in determining what weight to give the identifications. To the extent there was error, it was harmless.  Petitioner is not entitled to relief.

3.   <u>Eighth Amendment</u>

Petitioner contends that his aggregate sentence of life imprisonment plus eighty years, with a 60-year parole disqualifier, constitutes cruel and unusual punishment in violation of the Eighth Amendment.

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." See <u>Grecco v. O'Lone</u>, 661, F.Supp. 408, 415 (D.N.J. 1987) (citation omitted). Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation. See <u>Pringle v. Court of Common Pleas</u>, 744 F.2d 297, 300 (3d Cir. 1984). See also 28 U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" <u>Ewing v. California</u>, 538 U.S. 11, 20 (2003) (citations omitted). The Supreme Court has identified three factors that may be relevant to a determination of whether a sentence is so disproportionate to the crime committed that it violates the Eighth Amendment: "(1) the gravity of the offense and the harshness of the penalty; (ii) the

sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Solem v. Helm, 463 U.S. 277, 292 (1983). More recently, Justice Kennedy has explained that Solem does not mandate comparative analysis within and between jurisdictions, see Harmelin v. Michigan, 501 U.S. 957, 1004-05 (Kennedy, J., concurring in part and concurring in judgment), and he has identified four principles of proportionality review--"the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"--that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime," id. at 1001 (citation omitted) quoted with approval in Ewing, 538 U.S. at 23.

Here, Petitioner committed kidnapping, armed robbery, carjacking, aggravated sexual assault, and related crimes. The sentence was based in part, in addition, on Petitioner's criminal record and personal history, including a prior robbery and a prior sexual assault. He has presented no cogent argument why his sentence is unconstitutional. This Court finds that Petitioner's sentence is not "grossly disproportionate" to the

crimes he committed.  Petitioner is not entitled to relief on this claim.

    4.  <u>Evidentiary Hearing</u>

    Petitioner requests an evidentiary hearing.

    Prior to enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996), the Supreme Court held that "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." <u>Townsend v. Sain</u>, 372 U.S. 293, 312 (1963).  Indeed, in certain circumstances, an evidentiary hearing was mandatory.

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding.  In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.
>
> ...
>
> [A] federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Id. at 312-13.  The Supreme Court later refined this standard with respect to the fifth circumstance enumerated in Townsend, requiring a prisoner to "show cause for his failure to develop the facts in the state-court proceedings and actual prejudice resulting from that failure," but not otherwise curtailing the Townsend list.  Keeney v. Tamayo-Reyes, 504 U.S. 1, 11 (1992). Keeney's threshold standard of diligence was codified by AEDPA in the opening clause of new 28 U.S.C. § 2254(e)(2).  Williams v. Taylor, 529 U.S. 420 (2000).

Title 28 Section 2254(e) curtails the circumstances under which a District Court may grant an evidentiary hearing.  It provides:

> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A)  the claim relies on—
> (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or
> (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no

> reasonable factfinder would have found the applicant
> guilty of the underlying offense.

28 U.S.C. § 2254(e).

Thus, if a prisoner fails to develop the factual basis of a claim in State court proceedings, through some lack of diligence or greater fault attributable to the prisoner or the prisoner's counsel, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). Williams, 529 U.S. at 429-37. Conversely, where the facts have not been developed in State court proceedings through no fault of the prisoner or the prisoner's counsel, the prisoner is "excused from showing compliance with the balance of the subsection's requirements." Id. at 437.

> However, even if a new evidentiary hearing is
> permitted under AEDPA--when it is solely the state's
> fault that the habeas factual record is incomplete--
> AEDPA, unlike Townsend and Keeney, does not require
> that such a hearing beheld. Instead, federal courts
> have discretion to grant a hearing or not. In
> exercising that discretion, courts focus on whether a
> new evidentiary hearing would be meaningful, in that a
> new hearing would have the potential to advance the
> petitioner's claim.

Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000).

Finally, § 2254(e)(2)'s introductory language "does not preclude federal hearings on excuses for procedural default at the state level." Cristin v. Brennan, 281 F.3d 404, 413 (3d Cir. 2002).

Although Petitioner requests an evidentiary hearing, he fails to identify any deficiency in the record or any manner in which an evidentiary hearing would advance any of his claims. This Court finds no basis on which an evidentiary hearing would be meaningful.  The request for an evidentiary hearing is denied.

IV.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


/s/  Susan D. Wigenton
United States District Judge

Dated: **APRIL 27, 2007**